The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hoag and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award, except with correction of a date in the Conclusion of Law.
 ***********
The undersigned finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employer-employee relationship existed between plaintiff and defendant-employer at all relevant times.
3. Sentry Insurance Company is the carrier on the risk.
4. The average weekly wage can be obtained from the Form 21 Agreement.
5. Plaintiff is currently receiving temporary total disability payments.
6. The following medical reports have been stipulated into the record:
a. Park Ridge Hospital Occupational Health (1 p.)
b. Dr. Guthrie's notes (2 pp.)
c. Notes of Dr. Kroll (1 p.)
d. Notes of Dr. Desmond (1 p.)
e. Notes of Dr. Eaton (2 pp.)
f. Notes of Dr. Moody and Radiology report (3 pp.)
g. Blue Ridge Rehabilitation Medicine (4 pp.)
 h. All medical records included in the Industrial Commission file
 i. The parties did not stipulate to the introduction of reports completed by occupational health and vocational rehabilitation specialists.
7. The issues for resolution are:
 a. Did plaintiff unreasonably and unjustifiably refuse medical treatment to which he was ordered to submit by the Industrial Commission by refusing to complete work hardening and rehabilitation programs as well as medical examinations?
 b. If so, are defendants entitled to suspend payment of temporary total disability compensation to plaintiff?
 c. Is plaintiff entitled to implantation of a spinal cord stimulator?
d. Is plaintiff completely and totally disabled?
 ***********
The Full Commission adopts the Findings of Fact found by the Deputy Commissioner, with minor modifications, as follows:
 FINDINGS OF FACT
1. Plaintiff, born on 16 February 1965, was thirty-one years of age at the time of the hearing. He worked for Belding Corticelli Thread Company when he sustained an admittedly compensable low back injury on 27 June 1993, while lifting a tray of thread weighing approximately twenty pounds.
2. Plaintiff presented to the emergency room of Park Ridge Hospital in Hendersonville, North Carolina, where he was given a myelogram. The myelogram was negative, although the procedure resulted in leakage of spinal fluid. Plaintiff was prescribed physical therapy treatments and was released to return to work on 28 June 1993 with the restrictions of no standing, walking, stooping or lifting, but he failed to do so. He was not satisfied with his medical treatment.
3. Plaintiff had only several physical therapy treatments at the Occupational Health Clinic of Park Ridge Hospital. He was referred, at his request, for an orthopaedic evaluation by Dr. Todd Guthrie on 27 July 1993.
4. Prior to plaintiff's initial consultation with Dr. Guthrie, he underwent a lumbar MRI scan which was reported as normal, except for slight scoliosis. Dr. Guthrie diagnosed a right sacroiliac sprain and recommend that plaintiff continue working light duty with the restrictions of no prolonged sitting, standing, walking, lifting, bending or stooping. Plaintiff was not satisfied with Dr. Guthrie's evaluation or recommendations. On the witness stand, plaintiff insisted that he was not given a diagnosis by Dr. Guthrie or others that his back condition was merely a strain. Further, he was unaware whether or not he had, in fact, sustained a lumbar or sacroiliac strain.
5. Plaintiff next consulted Dr. Larry Kroll, an orthopedist in Asheville, North Carolina on 11 August 1993. Dr. Kroll diagnosed plaintiff as having a lumbar strain and ordered him to continue with his therapy and keep a follow-up appointment with Dr. Guthrie.
6. Dr. Guthrie scheduled plaintiff for a lumbar myelogram and lumbar CT scan on 30 August 1993. The results showed a minimal posterior disc bulge at L3-4, with no evidence of disc herniation or free disc fragments.
7. Subsequent to his myelogram, plaintiff developed increasingly severe headaches over the next two days, necessitating a return to the Park Ridge Hospital Emergency Room on 1 September 1993.
8. Dr. Guthrie requested that an anesthetist, Dr. Martin K. Abbott, treat plaintiff upon his return to the emergency room. Dr. Abbott diagnosed plaintiff's headaches as having been caused by a spinal leak at L4-5 that failed to close following his myelogram. Dr. Abbott closed plaintiff's spinal leak with an epidural blood patch.
9. On 7 September and 23 September 1993, plaintiff again presented to Dr. Guthrie, while continuing his course of physical therapy and medication, where he was given an epidural steroid injection.
10. During the course of his physical therapy at the Park Ridge Hospital Occupational Health Clinic, plaintiff was placed in a traction machine and left unattended. The machine placed pressure on plaintiff's legs. The resulting pressure caused an exacerbation of plaintiff's low back and radicular pain.
11. Plaintiff petitioned the Industrial Commission to have his care transferred to Dr. Robert Eaton, an orthopaedic surgeon in Hendersonville, North Carolina.
12. On 5 January 1994, plaintiff presented to Dr. Mark Moody, a spinal surgical specialist in Asheville, North Carolina, who recommended plaintiff for evaluation at Blue Ridge Behavioral Medicine Clinic. Dr. Moody scheduled plaintiff for a diskogram and repeat CT scan of the lumbar spine. On 14 March 1994, plaintiff underwent the diskogram procedure and a post-diskogram CT scan. The results of these tests showed minimal degenerative changes at L4-5 and L5-S1, but no disc herniation or disc bulge at any level. With the findings of the diskogram and CT scan, Dr. Moody concluded that plaintiff was not a surgical candidate. Dr. Moody recommending that plaintiff enroll in a Blue Ridge Rehabilitation Medicine comprehensive pain management and work hardening program, due to his diagnosis of myofascial pain and his deconditioning.
13. Plaintiff was scheduled to be evaluated by Dr. Jon Silver, an Asheville, North Carolina, neurosurgeon, on two occasions in March 1994. Both appointments were canceled due to plaintiff's refusal to attend.
14. On 31 March 1994, plaintiff presented to Blue Ridge Rehabilitation Medicine for an initial evaluation and psychological consultation prior to entry to the pain management/work hardening program. At that time, psychological testing revealed clinically significant levels of somatization (99th percentile). Plaintiff's presentation included significant preoccupation with his symptomology and a certitude of disease or severe injury. It was recommended that plaintiff be admitted to an outpatient comprehensive functional restoration program that consisted of twenty outpatient visits that included medically supervised treatment to eliminate plaintiff's use of narcotic analgesics.
15. In November 1993, defendants retained the services of Comprehensive Rehabilitation Associates, Inc., to provide assistance in the medical management of this claim. Karen Guetel, rehabilitation specialist with Comprehensive Rehabilitation Associates was assigned to this claim. On 13 December 1993, Guetel met with plaintiff, his wife, and his attorney to explain the role of a rehabilitation specialist in cases of this nature. During this initial meeting, plaintiff displayed hostile reactions in conversations with Guetel. He was particularly incensed about having to report each week, likening the experience to being on parole.
16. On 2 December 1993, at his request, plaintiff consulted Dr. R.F. Eaton, a Hendersonville, North Carolina, orthopedist. Dr. Eaton reviewed plaintiff's diagnostic tests and noted that the myelogram was quite normal and the bulging disc at L4-5 was insignificant. Dr. Eaton also concluded that plaintiff had sustained a back strain and was not a surgical candidate. Dr. Eaton recommended that plaintiff participate in rehabilitation, including psychological counseling. Dr. Eaton recommended Dr. Charles Shields, a pain rehabilitation specialist.
17. During plaintiff's initial evaluation at Blue Ridge Rehabilitation Medicine, plaintiff was accompanied by his wife. Plaintiff was hostile and sarcastic to the therapist who performed this initial evaluation.
18. Plaintiff reported to begin the pain management/work hardening program at Blue Ridge Behavioral Medicine on 4 April 1994, accompanied by his wife and children. On this occasion, plaintiff was uncooperative and failed to participate in the exercises involved in the program. The program was scheduled to last until 3:30 p.m. that day. However, plaintiff left at 11:15 a.m. and did not return for the remainder of the day stating as he left that he had done all he could do and was going home.
19. Plaintiff failed to report to the pain management/work hardening program at Blue Ridge Behavioral Medicine on 5 April 1994. He returned to Dr. Moody on 7 April 1994, and was instructed to re-enter the program.
20. Plaintiff returned to the program at Blue Ridge Behavioral Medicine on 8 April 1994, but again failed to complete a full session — leaving at 12:15 p.m. without authorization. Plaintiff failed to attend the program on 10 and 11 April 1994 and, consequently, was discharged from the program on 13 April 1994 for his failure to cooperate and participate in his individualized program.
21. Dr. Moody was advised of plaintiff's discharge from the pain management program and recommended that plaintiff be referred to a consultation with Dr. Duff Rardin, an Asheville neurologist. The carrier approved plaintiff's consultation with Dr. Rardin, which was scheduled for 21 April 1994. Plaintiff rescheduled his appointment with Dr. Rardin to 2 May 1994.
22. Plaintiff presented to Dr. Rardin on 2 May 1994, who recommended further EMG studies, which plaintiff refused to undergo.
23. Given plaintiff's refusal to participate in the recommended treatment, Dr. Moody released plaintiff from his care on 19 May 1994 and assigned plaintiff a 15% permanent partial disability rating to the back.
24. On 8 June 1994, defendants filed a Form 24 Motion to Stop Payment of Compensation for plaintiff's refusal to participate in the courses of treatment recommended by Drs. Guthrie, Kroll, Eaton and Moody. The Chief Claims Examiner denied defendants' Motion. Defendants filed a Motion for Reconsideration of the Chief Claims Examiner's decision, which was ruled upon by (former) Executive Secretary Nick P. Davis. In an Order filed 25 July 1994, defendants were ordered to continue payment of temporary total disability compensation to plaintiff until further order of the Industrial Commission. Defendants filed an appeal from the Executive Secretary's Order by filing an amended IC Form 33 pursuant to North Carolina Industrial Commission Rule 703 (1).
25. In the same 25 July 1994 Order described in Finding of Fact No. 24 above, (former) Executive Secretary Davis also ordered that plaintiff be evaluated by Dr. Todd Chapman of Charlotte, North Carolina, and comply with the prescribed course of medical treatment recommended by Dr. Chapman.
26. Plaintiff presented to Dr. Chapman of the Miller Orthopaedic Clinic in Charlotte on 9 September 1994 and again on 4 October 1994. After reviewing the results of plaintiff's prior diagnostic studies, Dr. Chapman concurred that plaintiff was not a surgical candidate. Dr. Chapman referred plaintiff to Thoms Rehabilitation Hospital for participation in a work hardening and pain management program, including aerobic conditioning and psychological counseling, under the direction of Drs. Freeman Broadwell and Edward Rubenstein, physicians with considerable experience and excellent results in biofeedback and relaxation techniques. Plaintiff, however, held a low opinion of these programs.
27. Defendants authorized and facilitated plaintiff's enrollment in a chronic pain management program at Thoms Rehabilitation Hospital in Asheville, North Carolina, beginning 14 November 1994. Plaintiff was discharged from the four-week inpatient program on 9 December 1994. At the time of discharge, Drs. Broadwell and Rubenstein felt that plaintiff should continue with two more weeks of inpatient therapy, followed by additional outpatient therapy, if necessary. Plaintiff's exhibited disruptive behavior during his participation in the inpatient program and lacked motivation.
28. Plaintiff was scheduled to return to the program at Thoms Rehabilitation Hospital on 4 January 1995. However, plaintiff refused to return to this program because he did not like the physical therapist or Dr. Rubenstein.
29. Plaintiff was seen by Dr. Chapman on 9 January 1995 complaining of headaches. At that visit, plaintiff reported that he did not get along with the physical therapist or Dr. Rubenstein at Thoms Rehabilitation Hospital. Dr. Chapman explained to plaintiff that was not accepting the full benefit of Dr. Rubenstein's services and convinced plaintiff to return to Thoms. Dr. Chapman recommended that plaintiff continue to see Dr. Rubenstein for biofeedback and relaxation techniques three times a week for one month in order to develop the skills to cope with his alleged pain. Plaintiff, however, did not return to Thoms as instructed by Dr. Chapman.
30. On 21 February 1995, plaintiff returned to Dr. Chapman and reported that he had not returned to Dr. Rubenstein as instructed, nor did he intend to do so.
31. Dr. Chapman respected plaintiff's wishes to discontinue his participation in the Thoms program. Plaintiff had extremely negative feelings about the program. Dr. Chapman, once again, explained to plaintiff that he was not allowing himself the opportunity to get the full benefit of going to Thoms Rehabilitation Hospital due to his refusal to participate in the program.
32. On 15 February 1996, defendants again filed a Form 24 Motion to Stop Payment of Compensation premised upon plaintiff's refusal to participate in the course of treatment designed to further his recovery as recommended by Dr. Chapman and as previously recommended by Drs. Guthrie, Kroll, Eaton and Moody. Defendant's Motion was heard in due course by Special Deputy Commissioner Amy L. Pfeiffer. Special Deputy Commissioner Pfeiffer filed an Order on 27 March 1996 declining to rule on the Form 24 Motion in the context of an administrative proceeding. Special Deputy Commissioner Pfeiffer referred the matter back to the Industrial Commission Docket Director to schedule a hearing.
33. Given plaintiff's continual refusal to fully cooperate and participate in the work hardening/pain management program, Dr. Chapman considered plaintiff a potential candidate for a Matrix spinal cord stimulator. Defendants have not authorized the Matrix spinal cord stimulator procedure.
34. Plaintiff was seen by Dr. James Hoski on 2 May 1995, for an evaluation of his condition and for a determination of his candidacy for a spinal cord stimulator. Dr. Hoski diagnosed plaintiff as having experienced a lumbar sprain/strain as a result of his compensable injury. Dr. Hoski recommended a course of treatment for plaintiff involving the completion of a work hardening/pain management program at Thoms Rehabilitation Hospital. Dr. Hoski determined that plaintiff was not a candidate for a spinal cord stimulator. Dr. Hoski based his conclusion on the fact that plaintiff's complaints were primarily of back pain, with no evidence of deferent leg pain — a requisite for a spinal cord stimulator, in his opinion.
35. On 16 April 1996, plaintiff was evaluated by Dr. Jon Michael Silver, another Asheville neurosurgeon. Although plaintiff initially refused to submit to an examination by Dr. Silver, he ultimately complied with the Order of the Commission granting defendants' Motion to Compel. Dr. Silver examined plaintiff and reviewed over 150 pages of medical records. In Dr. Silver's opinion, the best course of treatment for plaintiff was a comprehensive pain management program combined with work hardening.
36. Plaintiff is an angry person given to outbursts of temper and semi-profanity to indicate his displeasure at the medical care he has received, the procedures he has had to endure and his dislike of virtually every medical expert, rehabilitation specialist or vocational expert with whom he has come into contact.
37. Plaintiff's demeanor on the witness stand consisted of excessive acting out of symptomology including loud and inappropriate groaning, twitching, holding his head and maintaining the position of holding his legs straight out while he sits. Plaintiff admits to taking large amounts of narcotic pain medication.
38. Plaintiff's recollection of his behavior before medical therapy and exposure to occupational personnel, and his understanding of the nature of his compensable injury, are at some variance with the facts as related by other witnesses and by virtually all medical experts. Plaintiff insists he has never been given a diagnosis of lumbar sprain or strain. He asserts loudly and vociferously that he has complied precisely and fully with every medical recommendation. He denies he has ever been vulgar or been difficult.
39. Plaintiff severely magnifies his symptoms. He has not cooperated with efforts of health care and vocational rehabilitation specialists. Plaintiff has unjustifiably refused to comply with specific Orders of the Industrial Commission regarding treatment alternatives and medical examinations. He is not motivated to seek work, deal with the severe pain he alleges (other than to seek refills of pain prescriptions), or to make any attempt to cooperate with anyone who seeks to alleviate his pain, effect a cure or to lessen the extent, if any, of his disability. Given his personality, lack of motivation, tendency toward disruptive behavior and hostility, it is unlikely that there is any additional medical treatment that would be of value to plaintiff.
40. Plaintiff has been released by some of his physicians to return to work, but has made no effort to do so. Since plaintiff is fond of guns, it has been recommended by vocational experts that plaintiff become involved in a business involving the sale of firearms. Plaintiff has taken no action to do so, despite the fact that training has been offered by a vocational rehabilitation expert. Plaintiff also states he likes farming and living in rural areas, but has not attempted any farming work.
 ***********
Based on the Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable low back strain/sprain arising out of and in the course of his employment on 27 June 1993. N.C. Gen. Stat. § 97-2.
2. Plaintiff is not entitled to additional medical treatment in the form of a spinal cord stimulator which was only recommended due to plaintiff's unreasonable and unjustified refusal to fully cooperate and participate in his pain management/work hardening programs. Furthermore, medical experts have determined that the spinal cord stimulator is not appropriate for plaintiff's condition and symptoms and has a low degree of success in alleviating pain. N.C. Gen. Stat. §97-25.
3. Plaintiff's continuous refusal to cooperate in his medical treatment and rehabilitation efforts was unreasonable and unjustified and in defiance of a direct Order of the North Carolina Industrial Commission. Consequently, plaintiff is not entitled to temporary total disability compensation benefits commencing 14 April 1994 and continuing for so long as his unjustified refusal to submit to recommended medical treatment continues. In light of plaintiff's unreasonable and unjustified refusal to submit to examinations requested by the defendants or to cooperate and participate in the pain management/work hardening programs facilitated by the employer, plaintiff is not entitled to disability compensation benefits beginning 14 April 1994 and continuing until his refusal ceases or until further Order of the Commission. N.C. Gen. Stat. §§ 97-25, 97-27, 97-29.
4. Defendants are entitled to stop payment of compensation to plaintiff on the date of the filing of this Opinion and Award and are further entitled to an offset or credit against any future award of permanent disability compensation paid to plaintiff, if any, for all disability compensation paid to plaintiff from 14 April 1994 through the date of entry of this Opinion and Award. N.C. Gen. Stat. § 97-42.
5. Plaintiff reached maximum medical improvement on 19 May 1994 and has been assigned a 15% permanent partial disability rating to the back, which would entitle him to 45 weeks of permanent partial disability compensation. Given that defendants have, to date, overpaid plaintiff temporary total disability compensation in excess of 45 weeks, plaintiff is not entitled to any further disability compensation so long as he elects not to fully participate and cooperate in a pain management/work hardening program. N.C. Gen. Stat. §§ 97-2, 97-29, 97-31, 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD AND ORDER
1. Plaintiff's right to disability compensation benefits is hereby suspended commencing 14 April 1994 and continuing until plaintiff re-enters the pain management/work hardening program at Thoms Rehabilitation Hospital or until further order of the Industrial Commission.
2. Plaintiff claim for additional medical compensation in the form of a spinal cord stimulator must be, and is, DENIED.
3. Defendants are entitled to an offset or credit against any future claim for the 45 weeks of permanent disability compensation that plaintiff may have due to his 15% permanent partial impairment rating, for all disability compensation benefits paid to plaintiff during the period of his unreasonable and unjustified refusal to submit to examinations requested by the employer and his refusal to cooperate and participate in the pain management/work hardening programs facilitated by the employer commencing 14 April 1994 through the time of the issuance of this Opinion and Order.
4. Should plaintiff continue to refuse to fully cooperate and participate in medical treatment facilitated by the employer, particularly a pain management/work hardening program, he is not entitled to any additional compensation or disability compensation benefits under the Workers' Compensation Act.
5. Plaintiff shall bear the costs.
This ___ day of March 1998.
 S/ ______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/ ______________ THOMAS J. BOLCH COMMISSIONER
S/ ______________ CHRISTOPHER SCOTT COMMISSIONER
DCS/jlr